## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NOVA WILDCAT SHUR-LINE HOLDINGS, INC., *et al.*,[1] | Case No. 23-10114 (CTG) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF MARK ROSTAGNO, THE DEBTORS' PRESIDENT AND CHIEF EXECUTIVE OFFICER, IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Mark Rostagno, hereby declare under penalty of perjury:

1.     I am the President ("President") and Chief Executive Officer ("CEO") of debtor and debtor-in-possession Nova Wildcat Shur-Line Holdings, Inc. (the "Parent Debtor"), and each of the Parent Debtor's direct and indirect subsidiaries that are debtors and debtors-in-possession (collectively with the Parent Debtor, the "Debtors" and, each individually, a "Debtor").  I have held the titles of President and CEO of the Debtors since 2015.  I also am a member of the Board of Directors of the Parent Debtor (the "Parent Debtor Board") and have served in that position since 2015.  As President and CEO, I am responsible for overseeing the operations and financial activities of the Debtors, including monitoring cash flow, business relationships, and financial planning.  Prior to serving as President and CEO of the Debtors, I was a senior advisor in Alvarez and Marsal's private equity performance improvement practice.  Prior to working for Alvarez & Marsal, I was the President and Managing Director of Mondi Packaging Americas.  I also have

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Nova Wildcat Shur-Line Holdings, Inc. (1805); Nova Wildcat Shur-Line, LLC (8851); World and Main (Air), LLC (0035); World and Main (Cranbury), LLC (3903); HBC Holdings LLC (6461); and HBC Chemical LLC (6379).  The Debtors' corporate headquarters and service address is 324A Half Acre Road, Cranbury, NJ 08512.  I serve as the President for all of the Debtors.

served as the President of Dimplex Thermal Solutions, a part of the Glen Dimplex Group, and I held a series of more junior roles early in my career.

2.      On January 29, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition (collectively, the "Petitions") for relief under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").  To minimize the potential adverse impact of the commencement of these chapter 11 cases (the "Chapter 11 Cases"), the Debtors have requested certain "first day" relief in various applications and motions filed with the Court, each of which is listed in Section IV below (collectively, the "First Day Motions").  The First Day Motions seek relief intended to avoid the irreparable harm to the Debtors and preserve the value of the Debtors by, among other things, paying certain prepetition and administrative obligations to ensure the success of the Debtors' restructuring efforts and obtaining procedural relief that facilitates the Debtors' orderly transition into and emergence from these Chapter 11 Cases.  The relief is critical to the Debtors' restructuring efforts.

3.      As a result of my work as President and CEO of the Debtors, my review of relevant documents, and my discussions with other members of the Debtors' management and advisory teams, I am familiar with the Debtors' businesses, financial conditions, policies and procedures, day-to-day operations, and books and records.  I also am familiar with the Debtors' recent restructuring efforts, sale efforts, and related strategies.  Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' management or retained advisors that report to me in the ordinary course of my responsibilities.  References to the Bankruptcy Code, the chapter 11 process, and related legal matters are based on my understanding of such as explained to me by counsel.  I am over the age

of 18 and authorized to submit this declaration (the "<u>First Day Declaration</u>") on behalf of the Debtors. I submit this First Day Declaration to assist the Court and other parties in interest understand the circumstances leading to the commencement of these Chapter 11 Cases and in support of the First Day Motions. If called upon to testify, I would testify competently to the facts set forth in the First Day Declaration.

## <u>INTRODUCTION</u>

4.      The Debtors and their non-debtor subsidiaries (collectively, the "<u>Company</u>") comprise an affordable home and hardware products company branded commercially as H2 Brands Group Home & Hardware ("<u>H2B</u>"). The Company owns more than ten (10) brands and sources and distributes to various end retailers more than 10,000 products across multiple home-related product categories, including hardware, paint applicators, fans, heaters, plumbing, electrical, and locks/locksets. In short, the Company's portfolio of brands encompasses products intended for every room of the average consumer's home. The Company's products are sold through top retailers—the Company's customers—nationwide, including big box retailers, chain stores, local hardware stores, wholesalers, and online retailers.

5.      As explained more fully below, prior to the commencement of Chapter 11 Cases, the Debtors experienced liquidity and operational issues as a result of the COVID-19 pandemic and the accompanying supply chain disruptions. These challenges led to covenant defaults under the terms of the Pre-Petition Credit Agreement (as defined below) with PNC Bank, National Association ("<u>PNC</u>"), as administrative agent, beginning in the fourth quarter of 2020, which the Company cured in the second quarter of 2021. Separate defaults then occurred in the third quarter of 2021 and have remained uncured. Unable to remedy the covenant defaults pursuant to the terms

of the Pre-Petition Credit Agreement, the covenant defaults ripened into Events of Default (as defined in the Pre-Petition Credit Agreement).

6.      Following the occurrence of Events of Default, the Debtors and PNC entered into a series of forbearance and amendment agreements.  During the forbearance period and consistent with customary asset based credit facilities, PNC implemented the agreed upon cash management procedures set forth in the Pre-Petition Credit Agreement which required the sweeping of all cash receipts on a daily basis to payment of the pre-petition debt and requiring new borrowings under the Pre-Petition Credit Agreement for each disbursement.  Although the forbearances allowed the Debtors to explore various operational and financial restructuring options, as a result of the Debtors' continuing defaults and deteriorating financial condition, the Debtors' liquidity was significantly constrained at a critical time.

7.      During the forbearance period, the Debtors hired Novo Advisors ("Novo") as its financial advisor and risk officer and Paramax Group as its investment banker for the purpose of developing and implementing a marketing and sale process for a division of the Company operating under the "Shur-Line" brand.[2]  Additionally, the Company sold two affiliated subsidiaries, NewTech Electronics Industries, Inc. and Craig Electronics, Inc.  The proceeds of the sale were used to reduce the Debtor's outstanding indebtedness under the Pre-Petition Credit Agreement.

8.      Notwithstanding those sales, the Debtors continued to operate in an environment of constrained liquidity, which caused the Debtors to miss payments to vendors.  Without payment, certain vendors began terminating their relationship with the Debtors, which adversely affected the Debtors' ability to purchase new inventory.  Some of the unpaid vendors began threatening

---

[2]  Prior to the Petition Date, the Debtors terminated the engagement with Paramax Group.

and filing lawsuits, which served as a further drain on the Debtors' already limited financial resources.

9.      In December 2022, following expiration of the forbearance period on October 31, 2022, PNC delivered notice that it intended to exercise its rights under the Uniform Commercial Code to sell the Collateral (as that term is defined in the Pre-Petition Credit Agreement) in whole or in parts, by private sale or sales, sometime on or after December 26, 2022.  After receipt of that notice, the Debtors and PNC engaged in further discussions to determine the best operational and financial alternatives for maximizing value and to canvass the market for potential purchasers. Around the same time, the Debtors engaged SSG Capital Advisors, LLC ("SSG"), as its investment banker, and Carl Marks Advisory Group, LLC ("CMAG"), as its financial advisor, replacing Novo, to assist the Debtors in their consideration of strategic alternatives.

10.      The Debtors, in consultation with their advisors and PNC, ultimately determined that the best path forward was the commencement of these Chapter 11 Cases to implement a sale of substantially all of the Debtors' assets in one or more sales under section 363 of the Bankruptcy Code, which process will be conducted by SSG pursuant to market-standard and Court-approved sales procedures.  The Debtors believe a section 363 sale process will provide maximum value to all stakeholders, including the Debtors' unsecured creditors.

11.      To familiarize the Court with the Debtors, their business, the circumstances leading to these Chapter 11 Cases, and the relief that the Debtors are seeking in the First Day Motions, I have organized this First Day Declaration as follows:

- **Part I** provides an overview of the Company's corporate history and business operations;

- **Part II** provides an overview of the Debtors' organizational and capital structure;

- **Part III** describes the circumstances leading to these Chapter 11 Cases; and

- **Part IV** summarizes the Debtors' strategy in these Chapter 11 Cases and the evidentiary basis for the relief requested in each of the first day pleadings.

## I.    OVERVIEW OF THE DEBTORS' BUSINESS

### A.    The Company's Corporate History.

12.    The Company traces its evolution to the E.H. Tate Company, which was established in 1883 and manufactured a series of picture hanging products.  From 1883 through the late 1960s, E.H. Tate Company grew organically through a series of newly established companies servicing different manufacturing sectors, including electronics and paint products.  In 1969, E.H. Tate Company was acquired by Newell Brands.  Following the focused organic company growth through the 1960s, the next three decades under the Newell Brands umbrella were marked by growth through acquisition, including companies in the plumbing, home security, home hardware, and houseware sectors.  In September 2013, Newell Brands sold the Shur-Line and Bulldog Hardware brands to Nova Capital Management.  In August 2018, Nova Capital Management acquired World & Main, formerly known as Howard Berger Co.  Following the Company's growth over the last 140 years through a series of mergers and brand consolidations, the Company exists today as a one-stop shop for thousands of home and hardware products.

### B.    The Company's Business Operations.

13.    Today, the Company is a privately held brand portfolio housed under the H2B umbrella.  The Company owns more than ten (10) brands consisting of an assortment of consumable products intended to reach every room of the average consumer's home.

14.    The Debtors have two distinct revenue streams:  direct import ("DI") and domestic warehouse ("WH") sales.  Historically, DI sales activity was profitable and had low working capital requirements with a consistent, and generally reliable, ordering and fulfillment process.  U.S. domestic customers would place orders with the Company, and, in turn, the Company would

place purchase orders with its diverse vendor base (primarily located in Asia).  The Company's vendors would manufacture the products and prepare them for shipment.  The Company would then coordinate and manage the logistics for the U.S. customers pursuant to agreed-upon commercial terms.

15.     When completed products were released for shipment by the vendor, the Company would recognize revenue simultaneously with the U.S. customers receiving the goods they ordered at the point of shipment in Asia (*i.e.*, "FOB" shipping point).  In the DI business, the Company coordinates the ordering of product from its diverse vendor base and helps arrange the delivery of the product to the shipping point, at which time the customer takes control of the product and is responsible for bringing the product to the final destination.  Because the Company was placing orders for product for which it already had a customer, the product was listed as inventory on the Company's books for only a very short period of time (*i.e.*, until the customer took control of product at the shipping point).

16.     Through financing arrangements secured by the Company through internationally recognized banks, the Company was able to secure low-cost cash collection financing whereby the Company was able to collect its cash in twenty-five (25) days versus the 120-days or more—the terms customarily offered by large, U.S. big-box retailers (and the ultimate customer for the goods).  The Company also benefitted from DI revenue because the large, U.S. customers were responsible for paying their own transportation costs (which costs were increasing significantly during the pandemic) and customs duties, which added to the product costs to increase the final cost of the goods by up to an additional 25% through U.S. government imposed tariffs.

17.     The second method of recognizing revenue for the Company occurs via sales of product through the Company's U.S. distribution warehouses and/or 3PL partner.  Through three

(3) distribution centers (and a fourth distribution center operated by a third party, and which space the Company will cease operating out of in the coming weeks) in North America, the Company sells its products to retailers nationwide, including big-box retail companies, regional retailers, wholesale hardware stores, food and drug stores, industrial suppliers, small retail business/shop-owners primarily in New York City, and eCommerce (*e.g.*, Amazon) customers.  For its WH sales, the Company obtains product by placing orders with its overseas vendors and coordinates the importation into the United States and delivery of the product to its distribution centers in North America.  The Company also bears the cost of transporting the product from the vendor to its warehouses (plus paying all governmental tariffs), meaning the WH revenue stream begins with a significantly higher baseline cost than the DI revenue stream.

18.    A snapshot of the Company's owned brands follows:



19.    The Company operates in the following five (5) primary business segments, and a sixth business segment houses a number of miscellaneous business lines.

a.  <u>Home Environment</u>:  This business segment includes the Comfort Zone products, which is the #4 home environment brand in the United States.  This segment includes the broadest line of electric fans, heaters, humidifiers, and air purifiers.  This business segment benefits from strong and consistent seasonal demand plus recent growth due to evolving work-from-home trends stemming from the COVID-19 pandemic.  The home environment business segment is experiencing growth through e-commerce because online consumer demand is strong and the products are well suited for direct to consumer fulfillment.

b.  <u>Hardware and Security</u>:  This business line offers a broad range of products of over 3,000 SKUs ("stock keeping unit") across many hardware and security categories.  These brands include BULLDOG, Wordlock, ULTRA, GUARD, and EH Tate.  Many of these products are placed at major brick and mortar retailers, including Target, Menard's, Dollar General, Family Dollar, and Lowe's.

c.  <u>Paint Applicators</u>:   This product assortment offers a broad range of over 1,300 SKUs across multi-tiered price points.  The legacy product line in this business segment is the Shur-Line product, which is known as an innovation leader in the marketplace.  This business line also includes brands GAM Paint and PXpro.

d.  <u>Plumbing</u>:  This business segment includes more than 4,000 retail ready plumbing specialty items for the hardware trade.

e.  <u>Electrical</u>:  This business segment includes 345 SKUs focused on basic electrical items.

f.  <u>All Other Categories</u>:  These business lines include Housewares (Helping Hand is the leading supplier of home hardware products to supermarkets nationwide (utility carts, step stools, laundry, rope, and trash bags)); hand tools; pest control (Pest Guard offers a full line of products to handle everything from annoying flies to roaches); and lawn and garden.

**C.    Sales Channels.**

20.    As the Company has evolved over time, it has established foundational relationships and partnerships with premier retailers, including retailers with established e-commerce platforms and channels.  For example, the Company's products can be found in the following national retail (i.e., "big box") stores:  (i) Walmart; (ii) The Home Depot; (iii) Lowe's; (iv) Dollar General; (v) Family Dollar; (vi) Menards; and (vii) Target, among others.  The Debtors also have established sales channels in (a) regional retail stores, including Tractor Supply Co., Blaine's Farm and Fleet, and Mid-States, (b) hardware stores, including ACE Hardware,

TrueValue, and Pro Hardware, (c) large supermarket chains, including Safeway, Publix, Kroger, and Albertsons, and (d) drug stores such as CVS, Rite-Aid, and Walgreens.  In addition to the brick and mortar sales channels, the Company also has a growing e-commerce business through retailers with significant e-commerce presence, including Amazon, Walmart, Target, The Home Depot, Wayfair, Houzz, and Overstock.

> ### D.    Distributions and Warehouses.

21.    The Debtors' corporate headquarters is in Cranbury, New Jersey, where experienced professionals manage the design, production, and importation of the Company's products.  The Company also maintains an office in Wuxi, China, where Company personnel oversee vendor activities in the region and help manage logistics associated with the importation of product into the United States.  To ensure the timely delivery of products, the Company maintains integrated purchasing, importation, warehousing, sales, and distribution functions.

22.    As described herein, the DI process begins when a U.S. domestic customer places a purchase order with the Company in the United States.  Once the Company receives the purchase order, the Company's planning team in Cranbury, New Jersey, places its own purchase order with one or more of its foreign vendors, located primarily in China, Thailand, India, or Mexico.  In addition to managing the purchase order process with the Company's customers and vendors, the U.S. domestic and Wuxi, China-based operations teams focus on quality, safety, ocean logistics, replenishment, and vendor and customer relations for over 5,000 customers and more than 200 vendors to ensure timely delivery of goods to the foreign port.  Once the product arrives at the foreign port, the Company's customer takes possession of the product and coordinates its own transportation of the product to the final destination.

23.     The WH process begins when the Company places product orders with its vendors for the manufacture and delivery of product to a foreign port.  Once at the foreign port, the Company manages the logistics of transporting the product to North America and, after clearing U.S. Customs, into any of the Company's warehouses.  Once in a Company warehouse, the product is sold.  To facilitate the distribution of product throughout the United States, the Company maintains distribution centers in Cranbury, New Jersey, Freeport, Illinois, and Charlotte North Carolina.  The Company also utilizes a facility in Valencia, California (3PL) that it expects to exit in the coming weeks and previously maintained a distribution facility in Toronto, Canada.  Each distribution center and office is strategically placed to facilitate the seamless movement of product from the port to the purchaser in as short of a time period as is possible.

E.      **Financial Overview.**

24.     In the ordinary course of operating their businesses, the Debtors accrue accounts receivable across their various business lines.  As of December 31, 2022, the Debtors have significant accounts receivable (approximately $21 million) that are current.  The Debtors' current accounts receivable represent approximately 59% of their total accounts receivable (approximately $32 million).  As of December 31, 2022, the Debtors maintain inventory totaling approximately $57 million.

25.     Also as of December 31, 2022, the Debtors have domestic accounts payable totaling approximately $15 million, with the largest percentage of the payables (27%) current or aged less than 30 days.  The Debtors' total aged foreign accounts payable total approximately $40 million, as result of the Debtors' constrained liquidity leading to the commencement of these Chapter 11 Cases.

26.    In 2021, the Company generated more than $325 million in net sales and $12 million of EBITDA.  In 2022, net revenue was $256 million.

## II.    OVERVIEW OF DEBTORS' ORGANIZATIONAL AND CAPITAL STRUCTURE

### A.    The Debtors' Organizational Structure.

27.    The Parent Debtor currently owns or controls, directly or indirectly, each of the other Debtors.  The Parent Debtor is governed by the 5-member Parent Debtor Board, which board includes three members from the investor sponsor and the chief executive officer and chief financial officer.   A summary chart depicting the Debtors' corporate structure is attached as **Exhibit A**.

28.    More specifically, the Debtors are organized as follows:

a.    The Parent Debtor is a Delaware corporation that is a non-operating, holding company for its sole subsidiary—Nova Wildcat Shur-Line, LLC ("Shur-Line, LLC").  The Parent Debtor is governed and managed by the Parent Debtor Board.

b.    Shur-Line, LLC is a Delaware limited liability company and one of two primary operating companies within the Company's organizational structure.  Shur-Line, LLC is comprised of two business divisions, referred to as "Shur-Line" and "Bulldog."

c.    HBC Holdings, LLC ("HBC") is a Delaware limited liability company that is a non-operating, holding company for its three subsidiaries—World and Main (Air), LLC ("WAM Air"), World and Main (Cranbury), LLC ("WAM Cranbury"), and HBC Chemical, LLC ("HBC Chemical").

d.    WAM Air is a Delaware limited liability company with limited operations.

e.    WAM Cranbury is a Delaware limited liability company and the second of two primary operating company within the Company's organizational structure.

f.    HBC Chemical is a Delaware limited liability company that has limited assets, primarily pesticide chemical registrations, and no business operations.

**B.      The Debtors' Prepetition Indebtedness.**

*a.      Pre-Petition Credit Agreement.*

29.      Shur-Line, LLC, WAM Cranbury, and WAM Air, as borrowers (collectively, the "Pre-Petition Borrowers"), the several lenders party thereto (the "Pre-Petition Lenders"), PNC as administrative agent and collateral agent for each member of the Lender Group and the Bank Product Providers, (in such capacities, the "Pre-Petition Agent" and, collectively with the Pre-Petition Lenders, Issuing Banks, Swing Lender, Hedge Providers, Bank Product Providers, each other holder of any of the Obligations, and the respective successors and assigns of each of them, the "Pre-Petition Secured Parties"), and PNC Capital Markets LLC, as Lead Arranger, are each party to that certain *Credit Agreement* dated as of August 24, 2018 (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Pre-Petition Credit Agreement" and, together with all related loan documents, the "Pre-Petition Loan Documents").[3]  Pursuant to the Pre-Petition Loan Documents, the Pre-Petition Lenders provided Term Loans (the "Pre-Petition Term Loan Facility"), Revolving Loans (the "Pre-Petition Revolving Loan Facility"), outstanding letters of credit (the "Pre-Petition Letters of Credit" and, collectively with the Pre-Petition Term Loan Facility and the Pre-Petition Revolving Loan Facility, the "Pre-Petition Obligations") and other financial accommodations (collectively with the Pre-Petition Obligations, the "Pre-Petition Secured Facility") to, and for the account of, the Pre-Petition Borrowers.

30.      The Pre-Petition Secured Facility is guaranteed by Parent Debtor, HBC, and HBC Chemical (collectively, the "Pre-Petition Guarantors").  The Pre-Petition Obligations are secured

---

[3] 'Capitalized terms used but not defined herein shall have the meaning set forth in the Pre-Petition Credit Agreement.

by first priority security interests in and liens upon substantially all of the assets of the Pre-Petition Borrowers and the Pre-Petition Guarantors in existence as of the Petition Date (collectively, the "Pre-Petition Collateral") other than Excluded Property, subject only to any valid, perfected, and unavoidable lien or security interest otherwise existing as of the Petition Date, which are acknowledged to be senior in priority under the Pre-Petition Credit Agreement.

31.     The Pre-Petition Secured Facility matures on October 24, 2024.  LIBOR Rate Loans accrue interest at a *per annum* rate of the LIBOR Rate *plus* the LIBOR Rate Margin, while all other Obligations under the Pre-Petition Credit Agreement (except for undrawn Letters of Credit) accrue interest at a *per annum* rate equal to the Base Rate *plus* the Base Rate Margin.

32.     As of the Petition Date, the aggregate principal amount of outstanding Pre-Petition Obligations under the Pre-Petition Secured Facility was approximately $42.4 million, plus any and all applicable interest, fees, costs, expenses, charges, and other claims, debts, or obligations of the Pre-Petition Borrowers and Pre-Petition Guarantors to the Pre-Petition Secured Parties.

    *b.*  *Unsecured Obligations.*

33.     In the ordinary course of operating their businesses, the Debtors purchase goods and services from hundreds of trade creditors.  As of December 31, 2022, the Debtors' Accounts Payable recorded in the company's financials was approximately $55 million to third-party trade creditors.

34.     The Debtors also face a series of contingent, unliquidated, and disputed unsecured claims from certain litigation claimants affiliated with the January 9, 2022, fire in a high rise building at the Twin Parks North West, Site 4 apartment building in the Bronx, New York City, which resulted in the multiples deaths and injuries to individuals (the "Bronx Fire").  Investigators for the New York City Fire Department opined that the Bronx Fire was allegedly caused when an

electric space heater distributed by the Debtors ignited a mattress.  However, to date, it has not been confirmed whether the fire was a result of a defective product, user error, or some other cause. The investigation regarding the cause of the fire remains ongoing.

**C.    Equity Interests.**

35.    As of the Petition Date, non-debtor Nova Wildcat US Holdings, LP owns 100% of the equity interests in the Parent Debtor.  The general partner of Nova Wildcat US Holdings, LP is Nova Wildcat Holdings GP, LLC.

36.    As of the Petition Date, the Parent Debtor owns 100% of the membership interests of Debtor Shur-Line, LLC.

37.    As of the Petition Date, Debtor Shur-Line, LLC owns (i) 100% of the equity interests in non-debtor H2 Brands Canada Inc. and (ii) 100% of the membership interests of Debtor HBC Holdings, which in turn owns 100% of the membership interests in Debtor WAM Air, Debtor WAM Cranbury, and Debtor HBC Chemical.

38.    As of the Petition Date, Debtor WAM Cranbury owns (i) 100% of the membership interests in non-debtor HBC/FQ LLC and (ii) 100% of the equity interests in non-debtor Wordlock Inc. and non-debtor HBC Global Sourcing Wuxi Company Limited.

39.    As of the Petition Date, Debtor WAM Air owns 50% of the voting interests and 65% of the beneficial interests in non-debtor Project Air, LLC.

**III.    EVENTS LEADING TO CHAPTER 11 CASES**

40.    For decades, the Company's business has been fundamentally strong, providing significant value to a diverse customer base through coordination with its broad, global vendor base.  Through 2020, the Company successfully achieved consistent profitability.[4]  More recently,

---

[4] As measured as a product of the Company's annual EBITDA.

however, disruptions to the global supply chain have caused significant liquidity constraints that have unfavorably impacted the Company's operations and significantly affected the Company's performance, both its profitability and it cash flow conversion. While efforts were made by the Debtors to address liquidity and operational issues and secure out-of-court solutions that would have avoided the need to commence these Chapter 11 Cases, ultimately, after considering these options and exploring a sale of substantially all of the Company's assets under section 363 of the Bankruptcy Code, in consultation with their advisors and professionals, the Debtors decided to commence these Chapter 11 Cases to best safeguard assets and optimize the interests of all of the Company's stakeholders.

### A.    Supply Chain Issues.

41.    Like many businesses throughout the world, the Company experienced significant disruption to its supply chain during the COVID-19 pandemic commencing in the fourth quarter of 2019 and continuing through early 2022. Prior to the fourth quarter of 2019, the Company's importation process averaged thirty-five (35) days of ocean transit time from China to the U.S. with an average of $12 to $15 million of inventory in-transit at any point in time. Pursuant to the applicable business terms, the Company was required to pay vendors within sixty (60) days of shipment. This meant that the Company would receive the product in its U.S. domestic warehouses and have the product available for sale to customers for approximately thirty (30) days before it was required to pay its vendors for the product.

42.    During the pandemic, and due to unfavorable market conditions beyond the Company's control, transit times greatly increased to more than 150 days, which immediately reduced the Company's inventory available for sale. As a result, the Company needed to increase its volume of product imports to compensate for the increased lead time. The increased order

volume resulted in an additional $15 to $20 million of in-transit inventory (and accounts payable) to a high of $35 million, or more than $20 million above historical, pre-pandemic amounts. As a result, the COVID-19 pandemic inverted the Company's cash flow cycle. Pre-pandemic, the Company could order and receive (and in some cases, sell) product before paying for it. The pandemic-caused disruptions meant that, in many instances, the Company needed to pay for product before the product arrived.

43.     The Company's credit facility limited the amount of in-transit inventory that could be considered collateral supporting the facility's borrowing base. Therefore, despite the need to purchase inventory and pay vendors in sixty (60) days, the Company was unable to borrow additional funds and unable to pay vendors for the inventory while in-transit. As a result of the capital restriction, the Company's accounts payable balance grew significantly to more than $60 million (versus the historic $30 million).[5]    The increased accounts payable balance placed significant liquidity pressures upon the Company.

44.     The Company worked with its vendor base to extend payment terms to ninety (90) days. The Company also increased its selling prices on goods to help offset higher product costs and supply chain delays. Notwithstanding the Company's efforts to implement operational changes to combat pandemic-related disruptions, the Company could not overcome its reduced operational cash flow and lower product margins.

**B.     Pre-Petition Credit Agreement Covenant Defaults and Events of Default.**

45.     The Company has maintained a credit facility with PNC since August 2018 when the Company's sponsors secured the facility in support of its acquisition of World and Main, LLC. The Pre-Petition Credit Agreement has been amended six times: (i) for general business purposes

---

[5] At times during mid-2022, the Company's accounts payable balance peaked at more than $70 million.

(amendments one and two in February 2019 and March 2019, respectively); (ii) for the acquisition of Craig Electronics (third amendment on October 4, 2019); (iii) to cure an event of default relating to the fixed-charge coverage ratio and leverage ratio versus metrics required by the third amendment (fourth amendment in June 2021); and (iv) the Fifth Amendment and Sixth Amendment (as defined and described in detail below), both relating to the forbearance agreement entered into in August 2022, which, among other things, established targeted inventory levels and cash spending levels as part of recurring 13-week cash flow forecasts.

46.     Section 7.2 of the Pre-Petition Credit Agreement requires the Debtors to maintain as of the end of each fiscal quarter a certain Total Net Leverage Ratio.  The failure to maintain the certain Total Net Leverage Ratio for a period of more than twenty (20) days constitutes an Event of Default under the Pre-Petition Credit Agreement.  The Debtors failed to maintain the required Total Net Leverage Ratio for the four (4) fiscal quarter periods that ended as of September 2021. The Company and its equity sponsor, Nova Capital Management, worked with the lenders and the default was cured in November 2021 when Nova Capital Management contributed $3.5 million in cash to the Company.

47.     Subsequently, the Company failed to maintain the required Total Net Leverage Ratio for the four (4) fiscal quarter periods that ended as of June 2022, which triggered an Event of Default under the Pre-Petition Credit Agreement.  To forbear PNC and the Lenders' rights to exercise their remedies under the Pre-Petition Credit Agreement, the Debtors, PNC, and the Lenders entered into a fifth amendment and forbearance agreement (the "<u>Fifth Amendment</u>") on August 5, 2022.  Concurrent with the Fifth Amendment, Nova Capital Management contributed $1.5 million to the Company.

48.    Pursuant to the Fifth Amendment, the Debtors, PNC, and the Lenders agreed that the Forbearance Period (as defined in the Pre-Petition Credit Agreement) would expire on the earlier of (i) the close of business on October 31, 2022, or (ii) the occurrence of an additional Event of Default after the effective date of the Fifth Amendment.

49.    To assist with the Debtors' reporting obligations under the Pre-Petition Credit Agreement and to assist with the Debtors' liquidity and cash flow challenges, on August 4, 2022, the Debtors engaged Novo and Mr. Sandeep Gupta of Novo as the Debtors' Chief Risk Officer. Mr. Gupta was engaged to assist the Debtors' management team with identifying and implementing short-term and long-term profit improvement, liquidity generating, and debt reduction initiatives in an effort to improve the Debtors' ongoing viability.  Novo was engaged to develop and implement a financial improvement plan for the Debtors to include, among other things, evaluation of the Debtors' current inventory and current aged accounts receivables, to accelerate collections and identification of alternative strategic options, and to generate liquidity and debt reduction.

50.    Section 7.3 of the Pre-Petition Credit Agreement sets a limit on the maximum gross value of the Debtors' current inventory, and section 7.4(c) of the Pre-Petition Credit Agreement requires the Debtors to maintain a certain cash flow.  After the effective date of the Fifth Amendment, the Debtors defaulted under both sections 7.3 and 7.4(c) of the Pre-Petition Credit Agreement.  As a result, the Debtors requested a further forbearance to which PNC and the Lenders agreed, and a sixth amendment and forbearance agreement (the "Sixth Amendment") was entered on September 22, 2022.  The Sixth Amendment did not extend the Forbearance Period past October 31, 2022.  As a condition of the Sixth Amendment, Nova Capital Management contributed an additional $3.575 million to the Company on November 24, 2022.

51.    The Events of Default under the Pre-Petition Credit Agreement have not been cured.  Because the Forbearance Period expired, PNC and the Lenders could have exercised their remedies under the Pre-Petition Credit Agreement at any point after October 31, 2022.  Pursuant to section 3.2 of the Pre-Petition Credit Agreement, as a result of the Events of Default, no Lender has any further obligation under the Pre-Petition Credit Agreement to make any further revolving loans.

52.    On November 3, 2022 and December 8, 2022, PNC sent two reservation of rights letters, affirming, on behalf of itself and the Lenders, their rights to all remedies provided for in the Pre-Petition Credit Agreement as a result of the Events of Default.

53.    On December 16, 2022, PNC sent the Debtors a notification of intended disposition of collateral under section 9-610 of the Uniform Commercial Code (the "UCC Sale Notice").  The UCC Sale Notice informed the Debtors that PNC intended to sell the Collateral (as defined in the Pre-Petition Credit Agreement) in whole or in parts, by private sale or sales, sometime on or after December 26, 2022.  As of the Petition Date, PNC has not conducted a sale pursuant to the UCC Sale Notice.

54.    Since August 5, 2022 and pursuant to the terms negotiated in the original Pre-Petition Credit Agreement, as noted above all receipts deposited in any of the Debtors' bank accounts (all with PNC) have been swept automatically and applied to the PNC revolving loan. The Debtors' sale process prior to SSG's engagement had not yielded actionable proposals, and in December 2022, PNC expressed significant concerns about continuing to finance an uncertain sales process and advised Debtors that any further advances would be limited to payroll, taxes and critical expenses while Debtors continued to explore opportunities.

**C.    Additional Liquidity Challenges.**

55.    Due to the Company's tight liquidity and delayed payments to vendors, vendors have not maintained manufacturing schedules supporting the DI portion of the business and, as a result, the DI portion of the Company's business has become virtually nonexistent.  The near evaporation of the DI business line has removed more than $80 million in revenue, margin thereon, and approximately $10 to $20 million of accounts receivable collateral, which the Company would use in its asset-based lending borrowing base calculation and to fund disbursements and settle its accounts payable with its product vendors.  Without the DI business line, the Company's cash flow and liquidity are further strained.

56.    Additionally, the global supply chain disruptions have altered the formerly well-coordinated operations of domestic port facilities resulting in massive buildup of containers waiting for collection by U.S. companies.  Product first delayed crossing the ocean is further delayed by backups at these U.S. ports, where the lack of space and capacity within the port to offload cargo from ships further congest the port facilities.  The inability to timely offload cargo once in port causes a further bottleneck for the movement of product because trucks and trains cannot easily enter and leave port to deliver or collect containers.  Absent collection, containers sit in port facilities incurring demurrage penalties that have cost the Company millions of dollars—costs that are generally not available for offset via price increases from customers.

57.    Further, due to supply disruptions of ocean containers the Company obtained from third-party shipping companies, the Company's costs of ocean containers utilized for production importation increased to an average of approximately $8,800 per container (against a market that ranged from $10,000 to over $20,000, at the peak).  Prior to the supply disruptions, the Company paid approximately $2,500 per container on annual volume in excess of 2,000 containers.  These

transportation cost increases added over $12 million of additional costs. The Company sought to offset the negative impact on operating margins and cash flow through increases to the prices it charged to its customers.

### D. Potential Litigation-Related Liabilities.

58. As noted above, the Debtors' unsecured prepetition liabilities *may* include claims by litigation claimants affiliated with the Bronx Fire. Although the Debtors dispute liability for the claims, the Debtors are named as a defendant in approximately forty (40) cases with approximately 220 plaintiffs. The Debtors maintain insurance that currently is covering defense and litigation costs for the Bronx fire-related suits. To the extent any claims are found to be meritorious against the Debtors (the Debtors do not believe any are), the Debtors expect insurance to cover any judgments up to the policy limits. However, once the policy limits are reached, there could be additional exposure that would require the Debtors to pay out of pocket.

59. The Debtors also have received various litigation threats and demands as a result of nonpayment on various accounts payables. As of January 25, 2023, on a cumulative basis, the Debtors owe nearly $15 million to domestic vendors and nearly $40 million to foreign vendors. In particular, since the beginning of December, the Debtors have received thirty-three (33) separate litigation threats from China Export & Credit Insurance Corporation ("Sinosure") on behalf of certain policy holders with respect to unpaid balances that WAM Cranbury owes to the policy holders for outstanding payables. The Debtors understand that Sinosure is a state-funded insurance company that provides export credit insurance against non-payment risks for China's foreign trade and investment cooperation. As it relates to the Debtors, Sinosure represents various export and manufacturing companies to which WAM Cranbury has not be able to pay. Sinosure has

threatened that, if the Debtors fail to cooperate with its demands on behalf of its policy holders, the Debtors may be restricted from importing goods from China in the future.

**E.     Prepetition Marketing Of "Shur-Line" Brand And Sale Of Two Former Subsidiaries.**

60.     In an effort to increase cash flow and collect proceeds to reduce the Debtors' secured debt, on September 29, 2022, the Debtors engaged Paramax Group to assist with a prepetition marketing and sale process of the Company's division operating under the "Shur-Line" brand.  This process included contacting a number of strategic buyers that Paramax Group believed would be the most likely to purchase the assets related to the brand at the highest valuation.  The Debtors terminated their engagement of Paramax Group on January 24, 2023, in favor of including the potential sale of the "Shur-Line" brand as part of the SSG engagement.

61.     Additionally, and separate from the Paramax Group process, the Debtors were able to sell two related subsidiaries, NewTech Electronics Industries, Inc. ("NewTech") and Craig Electronics Inc. ("Craig").  NewTech and Craig previously were borrowers under the Pre-Petition Credit Agreement.  On November 17, 2022, PNC and the Lenders consented to the sale of NewTech and Craig and released both from the Pre-Petition Credit Agreement.  The Debtors used the sale proceeds of approximately $7.0 million to effectuate a substantial reduction of the prepetition indebtedness under the Pre-Petition Credit Agreement.

**F.     Reduced Operating Capacity.**

62.     Due to the cumulative effect of the events outlined above, in December 2022, the Debtors initiated an operational restructuring plan in which the Debtors:  (i) issued WARN Act notices to all employees, (ii) began closing certain of their facilities, and (iii) identified critical employees to stay onboard that will be needed for a successful sale process and chapter 11 emergence.  As of December 31, 2022, the Company operates in four facilities (Cranbury, New

Jersey, Freeport, Illinois, Charlotte, North Carolina, and a 3PL in Valencia, CA) with plans to fully exit Valencia by January 31, 2023.  As of January 17, 2023, the Debtors had 161 employees with plans to gradually reduce further the total number of employees.

      **G.  Prepetition Marketing Process.**

      63.  In December 2022, the Debtors and their advisors communicated with numerous investment banking and financial advisory firms regarding a potential engagement with the Debtors to assist with the marketing process and consideration of the Debtors' strategic alternatives.  Ultimately, several investment banking firms and financial advisory firms provided the Debtors and their advisors with their proposed material terms of engagement.  After an interview process, the Debtors ultimately engaged SSG as their new investment banker on December 20, 2022, and CMAG as their new financial advisor and Howard P. Meitiner, a managing director of CMAG, as the Debtors' Chief Restructuring Officer, on December 23, 2022.[6]

      64.  SSG was retained to provide investment banking services to the Debtors, focusing on the sale of all or part of certain of the Debtors' brands and assets.  Upon its retention, SSG immediately began conducting due diligence with respect to the Debtors' assets and operations. Based on those efforts, SSG began marketing preparations, including determining market interest in a potential sale of all or parts of the Debtors' assets.  This specifically included initiating and coordinating discussions with potential purchasers and advising the Debtors as to negotiating strategy and other matters in connection therewith.

      65.  Shortly after being engaged, SSG developed an extensive list of approximately 266 parties that SSG believes might be interested in acquiring some all or part of the Debtors' assets (the "Identified Parties").  SSG distributed to the Identified Parties initial opportunity materials,

---

[6]  The Debtors executed an amended the engagement letter with SSG on or about January 24, 2023.

including (i) a summary of the Debtors' assets, along with a general overview of the acquisition opportunity (*i.e.*, a "teaser" document); and (ii) a form of non-disclosure agreement.

66.     SSG also established a process that enabled each Identified Party that executed a non-disclosure agreement to perform due diligence.  This process included populating a typical sellside virtual data room that contained, among other items:  (i) a confidential information memorandum; and (ii) detailed due diligence materials consistent with those customarily shared in similar sale processes.

67.     As of the Petition Date, the Debtors have executed non-disclosure agreements with 46 potential bidders, and those potential bidders have received access to the virtual data room.  The Debtors and their advisors are actively facilitating diligence for potential bidders throughout this process.

68.     In sum, notwithstanding the Debtors' prepetition efforts, the filing of these Chapter 11 Cases was precipitated by, among other things, the Company's liquidity constraints and the mounting pressure from vendors for payments and their refusal to deliver products without assurances of payment, which placed the Debtors' business and their relationships with key customers, and, thus, its going concern value, at significant risk.  Accordingly, to preserve going concern value, the Debtors commenced these Chapter 11 Cases to obtain the immediate cash infusion provided under the DIP Credit Facility (as defined herein) and to implement a strategy for the sale of substantially all of the Debtors' assets in one or more sales under section 363 of the Bankruptcy Code.

## IV.   DEBTORS' CHAPTER 11 STRATEGY AND FIRST DAY MOTIONS

69.     The Debtors, in consultation with their advisors, have diligently evaluated a range of strategic alternatives to address their liquidity challenges.  Over the last seven months, the

Debtors' advisors have solicited and explored a range of alternatives, including a sale of substantially all of the Debtors' assets.  As explained above, these efforts resulted in a sale of NewTech and Craig and a substantial reduction of the Debtors' secured debt to PNC and the Lenders.  However, these pre-petition efforts did not completely relieve the Debtors of its secured debt and did not provide a viable path forward outside of chapter 11.

70.     Therefore, the Debtors commenced these Chapter 11 Cases to avail themselves of the protections and "breathing room" that chapter 11 is intended to provide.  Through these Chapter 11 Cases, the Debtors intend to seek approval from the Court for one or more sales of the Debtors' assets under section 363 of the Bankruptcy Code.  The Debtors believe that a sale of substantially all of its assets through one or more sales is in the best interests of the Debtors, their creditors, and all parties in interest.

71.     To enable the Debtors to fund these Chapter 11 Cases and to support the Debtors' sale efforts, PNC has agreed to provide the Debtors up to $48.5 million in postpetition, superpriority secured funding (the "DIP Facility").  The DIP Motion (as defined below) explains the terms of the proposed DIP Facility, pursuant to which PNC will provide the Debtors with a superpriority senior secured credit facility, $8 million of which will be made available upon interim approval by the Court, and the balance upon final approval by the Court.

72.     In connection with the filing of their Petitions, the Debtors filed the below-listed First Day Motions, which are explained in greater detail in **Exhibit B**, requesting relief that the Debtors believe it necessary to enable them to administer their estates with minimal disruption and loss of value during these Chapter 11 Cases.  The Debtors believe that the relief requested in the various First Day Motions appropriately balances the need for the Debtors to swiftly proceed with their operations and sale efforts with the due process and notice required under the Bankruptcy

Code, Bankruptcy Rules, and Local Rules.  The facts set forth in each of the First Day Motions

are incorporated herein in their entirety.

**Administrative Motions:**

a.    <u>Joint Administration Motion</u>.  *Debtors' Motion for an Order Authorizing Joint Administration of the Debtors' Chapter 11 Cases;*

b.    <u>Consolidated Creditors' List Motion</u>.  *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (B) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, and (C) Redact or Withhold Publication of Certain Personally Identifiable Information, (II) Approving the Master Service List, and (III) Granting Related Relief;*

c.    <u>Epiq Application</u>.  *Debtors' Application for Entry of an Order (I) Approving the Retention and Appointment of Epiq Corporate Restructuring, LLC as the Claims and Noticing Agent Effective as of the Petition Date, and (II) Granting Related Relief;*

d.    <u>Schedules and SOFAs Extension Motion</u>.  *Debtors' Motion for Entry of an Order Under 11 U.S.C. §§ 105(a) and 521 (I) Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs; and (II) Granting Related Relief;*

**Operational Motions Requiring Immediate Relief:**

e.    <u>Wages and Benefits Motion</u>.  *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Reimbursable Expenses, and Other Obligations and Account of Compensation and Benefits Programs and (B) Continue Compensation and Benefits Programs; and (II) Granting Related Relief;*

f.    <u>Customer Programs Motion</u>.  *Debtors' Motion for Entry of an Order, Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code, Authorizing Maintenance, Administration, and Continuation of Customer Programs;*

g.    <u>Taxes Motion</u>.  *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief;*

h.    <u>Utilities Motion</u>.  *Debtors' Motion for Entry of Interim and Final Orders Under 11 U.S.C. §§ 105 and 366 (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services to, or Discriminating Against, the Debtors; (II) Determining that the Utility Providers are Adequately Assured of Postpetition Payment; (III) Establishing Procedures for Resolving Requests for Additional Adequate Assurance; and (IV) Granting Related Relief;*

i.    <u>Critical Vendors Motion</u>. *Motion of Debtors for Entry of Interim and Final Orders Under 11 U.S.C. §§ 105(a), 363(b), 503(b)(9), 1107(a), and 1108 and Fed. R. Bankr. P. 6003 and 6004 (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Critical Vendors, (B) Shippers and Warehousemen, and (C) 503(b)(9) Claimants and (II) Granting Related Relief;*

j.    <u>Cash Management Motion</u>. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of Existing Cash Management System, Bank Accounts, and Business Forms and Payment of Related Prepetition Obligations; (II) Waiving the Requirements of 11 U.S.C. § 345(b); (III) Authorizing Continued Performance of Intercompany Transactions; and (IV) Granting Related Relief;* and

k.    <u>DIP Financing Motion</u>. *Debtors' Motion for Entry of Interim and Final Orders Under 11 U.S.C. §§ 105, 361, 362, 363 and 364 (I) Authorizing the Debtors, on a Final and Interim Basis, to (A) Obtain Post-Petition Financing, (B) Grant Liens and Superpriority Administrative Expense Claims to Post-Petition Lenders, and (C) Utilize Cash Collateral; (I) Providing Adequate Protection to the Pre-Petition Secured Parties; (III) Modifying the Automatic Stay; (IV) Granting Related Relief, Pursuant to 11 U.S.C. Sections 105, 361, 362, 363, 364 and 507; and (V) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2; and (IV) Granting Related Relief.*

73.    The First Day Motions request authority to, among other things, enter into the DIP Credit Facility and continue to use the Debtors' cash collateral, honor workforce-related compensation and benefits obligations, pay claims of certain critical vendors, suppliers, and taxing authorities, continue to honor customer programs, and continue the Debtors' cash management system and other operations in the ordinary course of business to ensure minimal disruption of the Debtors' business operations during these Chapter 11 Cases,  For the avoidance of doubt, the Debtors request authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in the First Day Motions.

74.    The Debtors have narrowly tailored their requests for immediate relief to those circumstances when the failure to receive such relief would cause immediate and irreparable harm to the Debtors and their estates.  I believe an ordinary transition into chapter 11 is critical to the viability of the Debtors' operations and that any delay in granting the relief described below could

hinder the Debtors' operations and cause irreparable harm. Other requests for relief will be deferred for consideration at a later hearing.

75.     I have reviewed each of the First Day Motions and am familiar with the content and substance contained therein. The facts set forth in each First Day Motion are true and correct to the best of my knowledge and believe with appropriate reliance on other corporate officers and advisors and I can attest to such facts. I believe that the relief sought in each First Day Motion: (i) will enable the Debtors to continue operations with minimal disruptions, (ii) is critical to ensure the maximization of value of the Debtors' estates through preserving customer, supplier, and other partner relationships, among other things, (iii) is essential to achieving a successful restructuring, and (iv) best serves the interests of the Debtors' estates and creditors.

## **CONCLUSION**

76.     The Debtors' ultimate goal in these Chapter 11 Cases is to achieve an orderly, efficient, consensual, and successful restructuring to maximize the value of the Debtors' estates for their stakeholders. To minimize any loss of value, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the course of these Chapter 11 Cases, with as little interruption or disruption to the Debtors' operations as possible. I believe that, if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving these objective and completing a successful restructuring will be substantially enhanced.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  January 30, 2023

Mark Rostagno
President and Chief Executive Officer
Nova Wildcat Shur-Line Holdings, Inc.
and its debtor affiliates