**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| NOVA WILDCAT SHUR-LINE HOLDINGS, INC., *et al.*,[1] | Case No. 23-10114 (CTG) (Jointly Administered) |
| Debtors. | Obj. Deadline: TBD[2] Hearing Date: TBD |

### DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE DEBTORS' SELECTION OF A STALKING HORSE BIDDER, (II) APPROVING BID PROTECTIONS IN CONNECTION THEREWITH, AND (III) GRANTING RELATED RELIEF

The debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors") hereby move (this "Motion") for entry of an Order, substantially in the form attached as **Exhibit A** (the "Proposed Order"), granting the relief described below.  In support of this Motion, the Debtors, through their undersigned counsel, respectfully represent as follows:[3]

### RELIEF REQUESTED

1.      By this Motion, the Debtors seek entry of the Proposed Order (a) approving Gordon Brothers Commercial & Industrial, LLC, on behalf of its contractual joint venture with Nations

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Nova Wildcat Shur-Line Holdings, Inc. (1805); Nova Wildcat Shur-Line, LLC (8851); World and Main (Air), LLC (0035); World and Main (Cranbury), LLC (3903); HBC Holdings LLC (6461); and HBC Chemical LLC (6379).  The Debtors' corporate headquarters and service address is 324A Half Acre Road, Cranbury, NJ 08512.

[2]  Contemporaneously with the filing of this Motion, the Debtors also filed the *Debtors' Motion for Entry of an Order Pursuant to Del. Bankr. L.R. 9006-1(e) Shortening the Notice and Objection Periods for, and Scheduling an Expedited Hearing on, Debtors' Motion for Entry of an Order (I) Approving the Debtors' Selection of a Stalking Horse Bidder, (II) Approving Bid Protections In Connection Therewith, and (III) Granting Related Relief.*

[3]  Capitalized terms used but not defined in this Motion have the meanings given in the Stalking Horse Agreement or the Bidding Procedures (each as defined herein).

Capital, Inc. or its designee, including the Partner (the "Buyer") as the stalking horse bidder, (b) authorizing the Bid Protections in connection therewith, and (c) granting related relief.

2.      In support of this Motion, the Debtors submit the *Declaration of J. Scott Victor in Support of the Debtors' Motion for Entry of an Order (I) Approving the Debtors' Selection of a Stalking Horse Bidder, (II) Approving Bid Protections in Connection Therewith, and (III) Granting Related Relief*, filed contemporaneously herewith (the "Stalking Horse Declaration").

## JURISDICTION AND VENUE

3.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Pursuant to Rule 9013-1(f) of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.      Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004, and 6006(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1, 6004-1, and 9006-1.

**BACKGROUND**

6. On January 29, 2023, each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned cases (collectively, the "Chapter 11 Cases"). The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases.

7. On February 17, 2023, the United States Trustee for Region 3 appointed a committee of unsecured creditors pursuant to section 1102(a)(1) of the Bankruptcy Code. *See* D.I. 73.

8. Additional information regarding the Debtors' business, their capital structure, and the circumstances leading to the filing of the Chapter 11 Cases is set forth in the *Declaration of Mark Rostagno, the Debtors' President and Chief Executive Officer, in Support of Debtors' Chapter 11 Petitions and First Day Motions* [D.I. 23] (the "First Day Declaration").

**PRELIMINARY STATEMENT**

**I.    The Marketing Process**

9. The Debtors believe that pursuing a comprehensive sale transaction is the best opportunity to maximize value for the benefit of all their stakeholders. As detailed in the First Day Declaration and the Victor Declaration,[4] the Debtors' investment banker, SSG Advisors, LLC

---

[4] *Declaration of J. Scott Victor in Support of Debtors' Motion for Entry of: (A) an Order (I) Approving Bidding Procedures in Connection with the Sale of Substantially All or Any Portion of the Debtors' Assets, (II) Authorizing the Debtors to Enter into One or More Stalking Horse Agreements, (III) Scheduling an Auction for and Hearing to Approve the Sale, (IV) Approving Notice of Respective Date, Time, and Place for Auction and for Hearing on Approval of Sale, (V) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (VI) Approving Form and Manner of Notice Thereof, and (VII) Granting Related Relief; And (B) An Order Authorizing and Approving (I) the Sale Free and Clear of Liens, Claims, Rights, Encumbrances, and other Interests, (II) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Related Relief* (the "Victor Declaration") [D.I. 52].

("SSG"), launched an extensive marketing process in December 2022. To date, SSG has contacted 298 potential buyers, 65 of which have executed non-disclosure agreements. A confidential information memorandum and detailed due diligence materials consistent with those customarily shared in similar sales processes have been made available to potential buyers in a typical sellside virtual data room. Currently, there are at least nine (9) active potential buyers conducting due diligence on the Debtors' business.

10.     On January 31, 2023, the Debtors filed their Bidding Procedures Motion[5] seeking entry of an order approving certain procedures (the "Bidding Procedures") that provide a clear and open process for the solicitation, receipt, and evaluation of third-party bids. The Court approved the Bidding Procedures by entry of an order (the "Bidding Procedures Order") on March 3, 2023 [D.I. 142]. Pursuant to the Bidding Procedures Order, the Debtors are requesting authority from the Court to appoint a Stalking Horse Bidder and provide such Stalking Horse Bidder with bid protections in connection with the Auction.

## II.    The Stalking Horse Bidder

11.     On March 7, 2023, the Debtors and the Buyer entered into an asset purchase agreement (including all exhibits and schedules related thereto, the "Stalking Horse Agreement"), which is attached as **Exhibit B**, whereby the Buyer proposes to purchase substantially all of the Debtors' assets (as further described in the Stalking Horse Agreement, the "Acquired Assets") for

---

[5] As used herein, the term "Bidding Procedures Motion" means the *Debtors' Motion for Entry of: (A) An Order (I) Approving Bidding Procedures in Connection with the Sale of Substantially All or Any Portion of the Debtors' Assets, (II) Authorizing the Debtors to Enter into One or More Stalking Horse Agreements, (III) Scheduling an Auction for and Hearing to Approve the Sale, (IV) Approving Notice of Respective Date, Time, and Place for Auction and for Hearing on Approval of Sale, (V) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (VI) Approving Form and Manner of Notice Thereof, and (VII) Granting Related Relief; and (B) an Order Authorizing and Approving (I) the Sale Free and Clear of Liens, Claims, Rights, Encumbrances, and other Interests, (II) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Related Relief* [D.I. 28].

cash consideration of approximately $27,100,190, subject to certain holdbacks and adjustments (the "Purchase Price").  The Stalking Horse Agreement also contemplates entry into a Transition Services Agreement, pursuant to which the Debtors will provide certain services to the Buyer for a defined period of time post-closing following consummation of the transaction while the Acquired Assets are transferred to the Buyer.

12.     Pursuant to the proposed Bidding Procedures, the Debtors will continue to solicit higher or otherwise better proposals.  The Debtors believe the proposed Bidding Procedures will provide sufficient time for any potential topping bidder to put forth an actionable competing Bid with the Buyer.  This market-tested process will yield the best value for the Assets and, in turn, maximize recoveries for the Debtors' stakeholders.  As set forth in the Stalking Horse Declaration, the "floor" price set by the Stalking Horse Agreement ensures the Debtors can fund a minimum level of recovery to their Pre-Petition Lenders and DIP Lenders, with the opportunity to further increase value to the estates by seeking higher or otherwise better bids.

**III.    Material Terms of the Stalking Horse Agreement.**

13.     The following chart summarizes the terms and conditions of the Stalking Horse Agreement and discloses certain information required pursuant to Local Rule 6004-1:[6]

| Stalking Horse Agreement Provision | Summary Description |
| --- | --- |
| **Stalking Horse Agreement Parties** | Sellers: Nova Wildcat Shur-Line Holdings, Inc., and its affiliates and subsidiaries |

---

[6] This summary is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Stalking Horse Agreement, the Stalking Horse Agreement shall govern in all respects.  Capitalized terms used in the following summary have the meanings given in the Stalking Horse Agreement.  All references to schedules or sections in the following summary shall refer to schedules or sections of the Stalking Horse Agreement.

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| | Buyer: Gordon Brothers Commercial & Industrial, LLC, on behalf of its contractual joint venture with Nations Capital, Inc. or its designee, including the Partner *See* Stalking Horse Agreement Preamble. |
| **Purchase Price** **Local Rule 6004-1(b)(iv)(N)** | Cash Purchase Price:   $27,100,190, subject to certain adjustments. *See* Stalking Horse Agreement §§ 3.1; 3.4; and 3.5. |
| **Stalking Horse Bid Protections** **Local Rule 6004-1(c)(i)(C)** | Breakup Fee: $813,006, which is equal to 3% of the Base Amount Expense Reimbursement: Up to $275,000 *See* Stalking Horse Agreement §§ 1.1; 12.2(b)-12.2(c) |
| **Acquired Assets** | The Acquired Assets listed in Section 2.1(a) of the Stalking Horse Agreement, including: (a)   All Designation Rights in connection with all of the Lease Real Property; (b)   All owned equipment, machinery, racking, material handling, supplies, furniture, vehicles, fixtures and improvements, tooling and spare parts, shop equipment, scrap materials, mechanical equipment, and other tangible personal property that is owned by a Seller Party and used in the operation of the Business; (c)   All Designation Rights in connection with all executory contracts and unexpired leases, including any operating or capitalized leases; (d)   All local, state and federal licenses, permits, and certifications; (e)   Other than the Excluded Intellectual Property, all Intellectual Property owned, used or held for use by the Seller Parties; (f)   All IT Systems and Software; (g)   All Inventory including but not limited to supplies, finished goods, raw materials, work-in-process, samples, |

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| | in-transit, packaging materials and other inventory of Seller located at Seller's distribution centers, warehouses, or at the market showroom locations;<br><br>(h)    All goodwill associated with the Acquired Assets or the Business;<br><br>(i)    All rights under warranties, indemnities, and all similar rights against third parties the extent related to the Business;<br><br>(j)    All rights under all active confidentiality, nondisclosure, noncompetition, non-solicitation, assignment of intellectual property, proprietary information, development and similar covenants and/or agreements made by vendors, supplies, service providers, customers, clients, distributors, dealers, licensors, licensees, employees, directors or consultants of the Seller Parties or any other person (other than such rights that are contained in commercial executory contracts that are not Assumed Contracts);<br><br>(k)    All documents and other books and records, correspondence (including e-mail communications), all vendor files, information and data, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, engineering and manufacturing data and other technical information and data, all know-how, and all other business and other records, in each case, that are primarily related to the Acquired Assets, the Assumed Liabilities or the Business, excluding Tax Returns and supporting records (including all working papers) other than those specifically related to the Acquired Assets;<br><br>(l)    All Accounts Receivable, including the right to receive and retain mail relating to Accounts Receivable payments and other communications of the Seller Parties and the right to bill and receive payment for services performed but unfilled or unpaid as of the Closing;<br><br>(m)    All credit card receivables; |

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| | (n)    All deposits (including deposits in transit, customer deposits and security deposits for rent, electricity, telephone, utilities or otherwise); |
| | (o)    Other than Claims or causes of action that constitute Excluded Assets, all rights, Claims or causes of action of the Seller Parties against any party arising out of events occurring prior to the Closing related to the Acquired Assets (whether matured or unmatured, direct or indirect, known or unknown, or absolute or contingent), including, for the avoidance of doubt, arising out of events occurring prior to the commencement of the Bankruptcy Case, and including any rights under or pursuant to any and all warranties, licenses, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to the Seller Parties, in each case, relating to the Acquired Assets; |
| | (p)    All avoidance Claims or causes of action available to the Seller Parties under chapter 5 of the Bankruptcy Code (including Sections 544, 545, 547, 548, 549, 550 and 553) or any similar actions under any other applicable Law against the following Designated Parties: (i) any of the Seller Parties' vendors, suppliers, customers or trade creditors, in each case, with whom Buyer continues to conduct business in regard to the Acquired Assets after the Closing, (ii) any Affiliates or Related Person of any of the Persons listed in clause (i) and (iii) the Partner; |
| | (q)    Other than the Excluded Bank Accounts, all bank, deposit accounts, control agreements and lockbox accounts associated with the collection of the Accounts Receivable or other proceeds from the Business or the Seller Parties' business, including all bank accounts that receive checks, ACH payments, and electronic payments related to the Accounts Receivable; |
| | (r)    (i) Fifteen percent (15%) of any Shur-Line Tariff Refund actually received by the Seller Parties or (ii) any other refund, overpayment, rebate or other payments (including any interests, penalties and/or fees) payable to the Sellers pursuant to Section 301 of the Trade Act of 1974, 19 U.S.C. § 2411, in each case actually received by the Seller Parties (or their estate); |

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| | (s)    All assets set forth on Schedule 2.1(t); and<br><br>(t)    All other assets that are related to or used in connection with the Acquired Assets or the Business (but excluding the Excluded Assets).<br><br>*See* Stalking Horse Agreement § 2.1. |
| **Excluded Assets** | The Excluded Assets listed in Section 2.2 of the Stalking Horse Agreement, including:<br><br>(a)    All Contracts, agreements, Leases, operating or capitalized leases, licenses and other arrangements that are not Assumed Contracts;<br><br>(b)    All books and records solely relating to any Excluded Assets;<br><br>(c)    All rights arising out of, relating to or reasonably necessary to enforce or enjoy the benefits of any Excluded Contract, including any deposit, refund, rebate, credit or payment due to any Seller Party solely to the extent such amount relates to an Excluded Contract;<br><br>(d)    All Cash;<br><br>(e)    All Personal Information that is nontransferable pursuant to the Bankruptcy Code, any applicable Law, or under any privacy policies or notices of the Seller Parties in effect at the time of collection of such Personal Information;<br><br>(f)    All causes of action, counterclaims, and defenses solely relating to any Excluded Asset;<br><br>(g)    All nontransferable Permits;<br><br>(h)    All rights of the Seller Parties under the Stalking Horse Agreement or any Transaction Document to which a Seller Party is a party;<br><br>(i)    All (i) records and reports prepared or received by any Seller Party or any of its Affiliates in connection with the sale of the Business or the transactions contemplated by this Agreement or any other Transaction Document, including all analyses relating to the Business or related to |

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| | Buyer or any third-party bidder or potential purchaser, (ii) all bids and expressions of interest received from third parties with respect to the Business, and (iii) all privileged communications described in the Stalking Horse Agreement;

(j)    All Equity Interests (and any other Equity Interests or rights convertible into Equity Interests) issued by or to any Seller Party or any of their direct or indirect Subsidiaries (including HBC Global Sourcing Wuxi Company Limited, Project Air, LLC, and H2 Brands Canada Inc.);

(k)    All Employee Benefit Plans and all assets solely related thereto;

(l)    All Insurance Policies, including the right to bring any Claims thereunder and the right to receive any proceeds related to any Excluded Liabilities;

(m)    Excluding the Shur-Line Tariff Refund, all rights to or claims for refunds, overpayments, or rebates of any Taxes paid, payable, or that become payable in connection with the Seller Parties or any of their respective Affiliates arising out of or relating to the Business, the Acquired Assets in respect of a taxable period ending on or before the Closing Date;

(n)    All Avoidance Actions against any Person who is not a Designated Party;

(o)    Eighty-five percent (85%) of (i) any Shur-Line Tariff Refund or (ii) any other refund, overpayment, rebate or other payments (including any interests, penalties and/or fees) payable to the Sellers pursuant to Section 301 of the Trade Act of 1974, 19 U.S.C. § 2411, in each case actually received by the Seller Parties (or their estate), as well as the right to pursue such Claims (in its sole discretion);

(p)    The Excluded Bank Accounts;

(q)    Any amounts held in escrow related to (i) the Customs Bond held by Edward J. Zarach & Associates Inc. (Declaration # B00126124) and (ii) the Customs Bond |

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| | held by Tokio Marine HCC – Surety Group (Account # 8026412229); |
| | (r)    The Excluded Intellectual Property; |
| | (s)    Any commercial tort and related claims related to the Excluded Assets or arising from or relating to any event or occurrence prior to the Closing Date; |
| | (t)    Any Claims or causes of action against any director or officer (or equivalent) and Related Persons of the Seller Parties; and |
| | (u)    Any consigned inventory pursuant to an enforceable and non-avoidable consignment agreement held on consignment for the benefit of Craig Electronics, Inc. or Newtech Electronic Industries, Inc. |
| | *See* Stalking Horse Agreement § 2.2. |
| **Assumed Liabilities** | The Assumed Liabilities listed in Section 2.3 of the Stalking Horse Agreement. |
| **Assumed Contracts** | The Assumed Contracts listed on Schedule 2.1(a) and Schedule 2.1(c). |
| **Excluded Liabilities** | Section 2.4 of the Stalking Horse Agreement provides that the Excluded Liabilities are:

(a)    Any Controlled Group Liability;

(b)    All Liabilities arising out of or relating to any Excluded Asset or any other asset that is not an Acquired Asset;

(c)    All Liabilities relating to amounts to be paid by the Seller Parties pursuant to the Stalking Horse Agreement, including the Transaction Expenses, the Expense Reimbursement Amount, and any other fees and expenses of brokers, counsel, accountants, consultants, and any other Representatives;

(d)    All Liabilities for Taxes (i) of any of the Seller Parties without regard to whether such Taxes relate to periods ending on or before the Closing Date or thereafter; (ii) with respect to the Acquired Assets attributable to any |

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| | Pre-Closing Period or arising from such Acquired Assets having been located in or in-transit to a Foreign Trade Zone as of the Closing Date or, with respect to a Straddle Period, the portion of the Straddle Period ending on the Closing Date; (iii) with respect to any Excluded Assets; (iv) for real property and personal property and similar ad valorem Taxes applicable to the Acquired Assets that accrue or otherwise relate to any taxable year or period (or portion thereof) ending or deemed to end on or prior to the Closing Date (including any penalties, fines, or similar additions to such Taxes that accrue after the Closing Date); or (v) of the Seller Parties or any their Affiliates for the Taxes of any Person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or non-U.S. Law);<br><br>(e)    All Employee Liabilities;<br><br>(f)    Any Liabilities of the Seller Parties under any Indebtedness of the Seller Parties, including the DIP Credit Agreement;<br><br>(g)    Any Liability arising out of any Proceeding against any Seller Party arising from any act, omission or occurrence prior to or as of the Closing Date;<br><br>(h)    Any Liability arising out of any Seller Party's violation of any Law;<br><br>(i)    Any Liability arising out of the failure of any Seller Party to comply with any Contract, agreement, lease, license, or arrangement;<br><br>(j)    Any Liability to any stockholder, Affiliate or Related Person of any Seller Party arising prior to the Closing Date; and<br><br>(k)    Any Liability arising from any recall or investigation of any Seller Party by any other Person of any products of such Seller Party.<br><br>*See* Stalking Horse Agreement § 2.4. |
| **Representations and Warranties by Seller Parties** | Customary representations and warranties by Seller Parties |

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| | *See* Stalking Horse Agreement Article 5. |
| **Representations and Warranties By Buyer** | Customary representations and warranties by Buyer<br><br>*See* Stalking Horse Agreement Article 6. |
| **Sale to Insider**<br><br>**Local Rule 6004-1(b)(iv)(A)** | N/A |
| **Agreements with Management**<br><br>**Local Rule 6004-1(b)(iv)(B)** | None, other than the services to be provided to Buyer pursuant to the transition services agreement, consistent with the terms set forth in the term sheet to be attached to the Stalking Horse Agreement.<br><br>*See* Stalking Horse Agreement § 7.10. |
| **Releases**<br><br>**Local Rule 6004-1(b)(iv)(C)** | Standard releases between the Seller Parties and Buyer, including of Affiliates, designees and respective directors, officers, employees, consultants, stockholders, managers, members, partners, agents, investors, advisors, and representatives.<br><br>*See* Stalking Horse Agreement § 7.6. |
| **Private Sale /**<br>**No Competitive Bidding**<br><br>**Local Rule 6004-1(b)(iv)(D)** | N/A. The Debtors have proposed an open Auction and sale process. |
| **Closing and Other Deadlines**<br><br>**Local Rule 6004-1(b)(iv)€** | <u>Closing</u>: Outside date of March 31, 2023<br><br>*See* Stalking Horse Agreement §§ 4.1; 12.1(d). |
| **Good Faith Deposit**<br><br>**Local Rule 6004-1(b)(iv)(F)** | <u>Deposit</u>: $2,710,019<br><br>*See* Stalking Horse Agreement § 3.2. |
| **Interim Arrangements with Proposed Buyer**<br><br>**Local Rule 6004-1(b)(iv)(G)** | The Parties will negotiate in good faith and agree to the form of a definitive transition services agreement consistent with and reflecting the terms set forth in the Stalking Horse Agreement and to be negotiated prior to the Closing.<br><br>*See* Stalking Horse Agreement § 7.10. |

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| **Use of Proceeds**<br><br>**Local Rule 6004-1(b)(iv)(H)** | At the Closing, the Buyer shall deliver or cause to be delivered to Seller, cash in an amount equal to the Estimated Purchase Price <u>minus</u> (i) the Good Faith Deposit, and <u>minus</u> (ii) the Adjustment Escrow Amount, by wire transfer of immediately available funds no less than three (3) Business Days prior to the Closing Date.<br><br>*See* Stalking Horse Agreement § 4.3.<br><br>The Stalking Horse Agreement does not contemplate the Debtors' use and/or application of the sale proceeds. The proposed Sale Order contemplates that the Seller Parties shall pay all fees and expenses due and owing to SSG Advisors, LLC and payments provided for under the Seller Parties' Key Employee Retention Program and Key Employee Incentive Program. The Sale Order also provides that net proceeds after payment of the foregoing must be paid in good, cleared funds to PNC Bank, National Association.<br><br>*See* Sale Order ¶¶ 28-30. |
| **Tax Exemption**<br><br>**Local Rule 6004-1(b)(iv)(I)** | None. |
| **Records Retention**<br><br>**Local Rule 6004-1(b)(iv)(J)** | Buyer agrees that it shall preserve and keep all original books and records in respect of the Business for the longer of (a) six years, (b) in the case of books and records related to Taxes, the expiration of the statute of limitation applicable to such Taxes, and (c) the period ending on the Wind-Up Date.<br><br>*See* Stalking Horse Agreement § 7.8. |
| **Sale of Avoidance Actions**<br><br>**Local Rule 6004-1(b)(iv)(K)** | Seller agrees to sell all avoidance Claims or causes of action available to the Seller Parties under chapter 5 of the Bankruptcy Code or any similar actions under any other applicable Law against (i) any of the Seller Parties' vendors, suppliers, customers or trade creditors in each case, with whom Buyer continues to conduct business in regard to the Acquired Assets after the Closing, (ii) any Affiliates or Related Person of any of the Persons listed in <u>clause (i)</u> and (iii) the Partner; <u>provided</u>, <u>however</u>, that it is understood and agreed by the Parties hereto that Buyer will not pursue or |

| Stalking Horse Agreement Provision | Summary Description |
|---|---|
| | cause to be pursued any Avoidance Actions against any of the Designated Parties other than as a defense (to the extent permitted under applicable Law) against any claim or cause of action raised by such Designated Party.<br><br>*See* Stalking Horse Agreement § 2.1(q). |
| **Requested Findings as to Successor Liability**<br><br>**Local Rule 6004-1(b)(iv)(L)** | The Sale Order shall, among other things, (a) approve pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by the Seller Parties of this Agreement, (ii) the sale of the Acquired Assets to Buyer on the terms set forth herein and free and clear of all Liens (other than Permitted Liens), and (iii) the performance by the Seller Parties of their respective obligations under this Agreement; (b) find that Buyer is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code and the sale is entitled to the protections afforded under Section 363(m) of the Bankruptcy Code; (c) find that Buyer shall have no Liability for any Liability that is not an Assumed Liability; and (d) find that Buyer did not engage in any conduct which would allow this Agreement to be set aside pursuant to Section 363(n) of the Bankruptcy Code.<br><br>*See* Sale Order ¶¶ P and 15. |
| **Sale of Unexpired Leases Free and Clear**<br><br>**Local Rule 6004-1(b)(iv)(M)** | *See* Stalking Horse Agreement § 2.5. |
| **Relief from Bankruptcy Rule 6004(h)**<br><br>**Local Rule 6004-1(b)(iv)(O)** | The Debtors have requested a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h). |

## IV.    The Bid Protections.

14.    As set forth above, the Stalking Horse Agreement contemplates Bid Protections in the form of a breakup fee equal to 3.0% of the Purchase Price (the "Breakup Fee"), payable pursuant to the Stalking Horse Agreement, including in the event the Debtors consummate an

alternative transaction, and a provision for reimbursement of reasonable and documented fees and expenses not to exceed $275,000 (the "Expense Reimbursement").

15.     By this Motion, the Debtors seek entry of an order approving the Bid Protections. The Bid Protections are a necessary component of the Stalking Horse Agreement, and the Debtors do not believe that the Buyer would have submitted a proposal, let alone permitted such proposal to be subject to superior offers, without the Bid Protections.  The Bid Protections promote more competitive bidding for the Acquired Assets by inducing the Buyer to hold its offer open as a minimum bid on which other bidders and the Debtors can rely.  Therefore, the Buyer has helped lay the foundation for the final phase of the Debtors' sale process and will serve as a catalyst for other Qualified Bids.  Executing the Stalking Horse Agreement has put the Debtors in a comfortable position to solicit competing Bids that may be materially higher or of otherwise better value to the Debtors' estates than the Stalking Horse Agreement.  The Stalking Horse Agreement also increases the likelihood that the price at which the Assets in the Stalking Horse Agreement are sold will reflect their true market value.  Accordingly, the Debtors believe that the benefit of the Stalking Horse Agreement outweighs the cost associated with the Bid Protections.

16.     Additionally, in connection with the Bid Protections, the Debtors propose that, at any Auction, the Baseline Bid for substantially all of the Debtors' assets should be the greater of (i) the Stalking Horse Bid and (ii) any other Qualified Bid (or Qualified Bids when considered together) that exceeds the Stalking Horse Bid by at least the aggregate amount of $200,000 *plus* the Break-Up-Fee *plus* the Expense Reimbursement Amount.  If the Stalking Horse Bid is the Baseline Bid, the initial Minimum Overbid for an Auction Package containing substantially all of the Debtors' assets should be the aggregate amount of $200,000 *plus* the Break-Up-Fee *plus* the Expense Reimbursement Amount.  Otherwise, the Minimum Overbid for an Auction Package

containing substantially all of the Debtors' assets should be $100,000.  The Bidding Procedures Order permits the Debtors to determine the Baseline Bid and the Minimum Overbid, and the Debtors believe that the proposed Baseline Bid, initial Minimum Overbid, and increments for the Subsequent Bids help maximize the value of the Debtors' assets by providing clear bidding guidelines to interested parties.

## BASIS FOR RELIEF

I.     **The Selection of the Buyer as the Stalking Horse Bidder Should be Approved as an Exercise of the Debtors' Sound Business Judgment.**

17.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  A sale of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction. *See, e.g.*, *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' . . ."); *see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (same); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Telesphere Commc's, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

18.    Once debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision, the directions of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995) (citations omitted); *In re Filene's Basement, LLC*, 2014 LEXIS 2000, *40 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate") (citations omitted); *In re*

*Integrated Res*., 174 B.R. 650, 656 (S.D.N.Y. 1992); *In re Johns-Manville, Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

19.     As set forth above, the Debtors have a sound business justification for selecting the Buyer as the Stalking Horse Bidder.

20.     *First*, as set forth in the Stalking Horse Declaration, the Debtors engaged in extensive, arm's-length negotiations with multiple interested parties before selecting the Buyer as the Stalking Horse Bidder.  Ultimately, the Debtors and SSG determined that the Bid submitted by the Buyer through the Stalking Horse Agreement provides substantial value for the estates and that the Buyer is prepared to move quickly to complete its diligence process and execute definitive documentation for a Sale Transaction in advance of the Bid Deadline.

21.     *Second*, the sale of the Assets pursuant to the Stalking Horse Agreement will be subject to competing Bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets.  Consequently, the ultimately successful Bid, after being subject to a "market check" in the form of the Auction, will constitute, in the Debtors' reasonable business judgment, the highest or otherwise best offer for the Assets and will provide a greater recovery for their estates than any known or practicably available alternative.  *See, e.g.*, *In re Trans World Airlines, Inc.*, 2001 Bankr. LEXIS 980, *13 (Bankr. D. Del. Apr. 2, 2001) (while not required by section 363(b) "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

22.     *Third*, as noted above, SSG will continue to market the Assets and solicit other offers consistent with the proposed Bidding Procedures, including, for example, by contacting previously solicited and new parties, continuing to provide potential Bidders with data room access

and requested information, and otherwise assisting the Debtors with all efforts to increase the transaction value.  Therefore, the number of bidders that are eligible to participate in a competitive Auction process will be maximized, or, if no Auction is held because no Auction is necessary, the Purchase Price contemplated by the Stalking Horse Agreement will, conclusively, result in fair value.

23.    As such, the Debtors submit that the winning Bidder's Bid will constitute the highest or otherwise best offer for the Assets and will provide an equal or greater recovery for the Debtors' estates than would be otherwise provided absent approval of a Stalking Horse Bidder.

24.    Therefore, the Debtors request the Court make a finding that the selection of the Buyer as the Stalking Horse Bidder is a proper exercise of the Debtors' business judgment.

## II.    The Bid Protections Have A Sound Business Purpose and Should Be Approved.

25.    The Debtors are seeking authority to offer customary Bid Protections to the Buyer. The Expense Reimbursement and the Breakup Fee (if required) will be paid to the Buyer from the proceeds of an Alternative Transaction or directly by the Lender in the event a credit bid is the Alternative Transaction, or as an allowed administrative expense priority claim in the event an Alternative Transaction does not close.  The use of a stalking horse in a public auction process for sales pursuant to 363 of the Bankruptcy Code is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value."  *Official Committee of Unsecured Creditors v. Interforum Holding LLC*, 2011 U.S. Dist. LEXIS 73421, *4 n.1 (E.D. Wis. July 7, 2011).  As a result, stalking horse bidders virtually always require break-up fees (and, in many cases, other forms of bid protections) as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders

with access to the due diligence necessary to enter into an asset purchase agreement." *Id.* (internal citations omitted). Thus, the use of bid protections has become an established practice in chapter 11 cases.

26.     Indeed, break-up fees and other forms of bid protections are a normal and, in many cases, necessary component of significant sales conducted under section 363 of the Bankruptcy Code. "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . [.] In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be ***necessary*** to discharge [such] duties to maximize value." *Integrated Res.*, 147 B.R. at 659-60 (emphasis added). Specifically, bid protections "may be legitimately necessary to convince a "white knight" bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (citations and quotations omitted); *see also Integrated Res.*, 147 B.R. at 660-61 (noting bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid."); *In re Hupp Int'l Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence.").

27.     As a result, courts in this Circuit routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999) ("In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate."). The Debtors believe that, in connection with designating a Stalking Horse

Bidder, the Bid Protections are necessary and, together with the Bid, provide the Debtors' estates a floor for further bidding that may increase the consideration given in exchange for the Assets.

28.     Based on the marketing process that the Debtors and SSG have conducted thus far, the Debtors have determined that the Bid Protections were necessary to attract and retain the Buyer. Indeed, the Bid Protections were a material inducement for, and a condition of, the Buyer's submission of the Bid—the Debtors and the Buyer specifically negotiated the terms of the Bid Protections in back-and-forth, arm's length negotiations.  Moreover, by inducing the Buyer to hold its offer open as a baseline from which other potential bidders can submit higher or better offers, the Bid Protections serve to encourage more competitive bidding, which will hopefully increase the purchase price of the Acquired Assets or the Assets.  As such, the Bid Protections will, among other things, enable the Debtors to maximize the value of their estates for the benefit of all economic stakeholders in these Chapter 11 Cases.

29.     Furthermore, as set forth in the Stalking Horse Declaration, the Debtors believe that the Bid Protections are well within market, and fair and reasonable in amount in light of the size and nature of the proposed Sale Transaction, and the efforts that will have been expended by the Buyer in connection with negotiating and entering into the Stalking Horse Agreement, which will serve as the baseline for other Bids for the Assets.  In addition, given that the Breakup Fee will be paid out of the proceeds of any competing Sale Transaction that may be consummated, such payment will not diminish the Debtors' estates.  Finally, the Buyer is not an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

30.     The Bid Protections fall within the range of bid protections typically approved by bankruptcy courts in the Third Circuit.  When considered together, the combined total Breakup Fee and Expense Reimbursement, or three percent (3.0%) of the Purchase Price, plus up to

$275,000 of Expense Reimbursement, is consistent with the range of bid protections typically paid in sale transactions that court have approved recently. *See, e.g.*, Stalking Horse Declaration; *see also In re Agspring Miss. Region, LLC*, Case No. 21-11238 (CTG) (Bankr. D. Del. Oct. 14, 2021) [D.I. 103] (approving bid protections of 3% of the purchase price); *In re Sequential Brands Grp., Inc.*, Case No. 21-11194 (JTD) (Bankr. D. Del. Sept. 24, 2021) [D.I. 138] (approving bid protections of 3.65% of the purchase price); *In re Knotel, Inc.,* et al., Case No. 21-10146 (MFW) (Bankr. D. Del. Mar. 11, 2021) [D.I. 418] (approving bid protections of 3% of the purchase price); *In re Brooks Brothers Grp., Inc.,* et al., Case No. 20-11785 (CSS) (Bankr. D. Del. Aug. 3, 2020) [D.I. 285] (approving bid protections of 3% of the purchase price); *In re Things Remembered, Inc*., No. 19-10234 (KG) (Bankr. D. Del. Feb. 21, 2019) (approving break-up fee and expense reimbursement equal to 4.4% the purchase price).[7]

31.     For the foregoing reasons, the Debtors respectfully request that the Court authorize the Bid Protections.

**III.    Relief Under Bankruptcy Rule 6004(h) Is Appropriate.**

32.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."  The authority to pay the Bid Protections to the Buyer is a necessary component of its Bid, and the Stalking Horse Agreement will have the greatest potential to help maximize value to the estates if it is approved and finalized prior to the deadline for competing bidders to submit Bids on March 15, 2023.  To maximize the value received for the Acquired

---

[7]  In accordance with Local Rule 7007-2(a)(vii), the Debtors' proposed counsel has copies of each order and will make them available to this Court or to any party that requests them.  The orders also are available on this Court's CM/ECF Pacer site at the cited docket numbers and on the dates specified above.

Assets, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rule 6004(h).

## **NOTICE**

33.     Notice of the hearing on the relief requested in this Motion will be provided by the Debtors to the Sale Notice Parties identified in the Bidding Procedures.  Based on the nature of the relief requested herein, the Debtors respectfully submit that no other or further notice is necessary.

## **NO PRIOR REQUEST**

34.     No prior motion for the relief requested herein has been made to this Court or to any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order, substantially in the form attached as **Exhibit A**, granting (i) the relief requested in this Motion and (ii) such other relief to the Debtors as is appropriate.

*[The remainder of this page was intentionally left blank.]*

Dated: March 7, 2023
      Wilmington, Delaware

Respectfully submitted,

**REED SMITH LLP**

*/s/ Jason D. Angelo*
Kurt F. Gwynne (No. 3951)
Jason D. Angelo (No. 6009)
1201 North Market Street, Suite 1500
Wilmington, DE 19801
Telephone:  (302) 778-7500
E-mail:  kgwynne@reedsmith.com
       jangelo@reedsmith.com

 - and -

Omar J. Alaniz, Esq. (admitted *pro hac vice*)
Bradley J. Purcell, Esq. (admitted *pro hac vice*)
Devan J. Dal Col, Esq. (admitted *pro hac vice*)
2850 N. Harwood St., Suite 1500
Dallas, TX 75201
Telephone:  (469) 680-4200
E-mail:  oalaniz@reedsmith.com
       bpurcell@reedsmith.com
       ddalcol@reedsmith.com

 - and -

Luke A. Sizemore, Esq. (admitted *pro hac vice*)
Amy M. Kerlin, Esq. (admitted *pro hac vice*)
Reed Smith Centre
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222
Telephone:  (412) 288-3334
E-mail:  lsizemore@reedsmith.com
       akerlin@reedsmith.com

*Proposed Counsel for the Debtors and*
*Debtors-in-Possession*