IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>NOVA WILDCAT SHUR-LINE HOLDINGS, INC., *et al.*,[1]<br><br>                Debtors. | Chapter 11<br><br>Case No. 23-10114 (CTG)<br>(Jointly Administered)<br><br>Re: **Docket No. 153** |

**DECLARATION OF J. SCOTT VICTOR IN SUPPORT OF THE
DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING
THE DEBTORS' SELECTION OF A STALKING HORSE BIDDER,
(II) APPROVING BID PROTECTIONS IN CONNECTION THEREWITH,
AND (III) GRANTING RELATED RELIEF**

I, J. Scott Victor, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1. I submit this declaration in support of the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Selection of a Stalking Horse Bidder, (II) Approving Bid Protections in Connection Therewith, and (III) Granting Related Relief* (the "Stalking Horse Motion"), filed contemporaneously herewith.[2]

2. I am a founding partner and Managing Director of SSG Advisors, LLC ("SSG"), which has a principal place of business at 300 Barr Harbor Drive, Suite 420, West Conshohocken, Pennsylvania 19428. SSG is the proposed investment banker to the debtors in the above-captioned chapter 11 cases (the "Debtors").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Nova Wildcat Shur-Line Holdings, Inc. (1805); Nova Wildcat Shur-Line, LLC (8851); World and Main (Air), LLC (0035); World and Main (Cranbury), LLC (3903); HBC Holdings LLC (6461); and HBC Chemical LLC (6379). The Debtors' corporate headquarters and service address is 324A Half Acre Road, Cranbury, NJ 08512.

[2] Capitalized terms used but not defined in this Declaration have the meanings given in the Stalking Horse Motion.

3.     Except as otherwise indicated, all statements set forth in this Declaration are based on my personal knowledge of the Debtors' prepetition and postpetition marketing process and Bidding Procedures, my discussions with the Debtors' senior management, other members of the SSG team, and the Debtors' other advisors, and my review of relevant documents and/or my opinion based upon my experience.

4.     I have 40 years of experience handling complex financial and other restructuring matters for a variety of companies (distressed or otherwise and both in- and out-of-court) across a wide spectrum of industries. I have completed over 250 sale, refinancing, and restructuring transactions in North America and Europe for companies facing operational and financial crises. My areas of expertise include, among other things, (a) conducting sale processes both in- and out-of-court for companies undergoing financial distress and (b) restructuring and refinancing transactions.

5.     I am not being specifically compensated for this testimony other than through payments SSG will receive as the proposed investment banker to the Debtors. I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors. If called to testify, I could and would competently testify to the facts set forth herein.

### The Marketing Process and Selection of Stalking Horse Bidder

6.     As described in my declaration [D.I. 52] in support of the Bidding Procedures Motion [D.I. 28], SSG was engaged by the Debtors in December 2022 to evaluate strategic alternatives, including a potential sale process. SSG began marketing the Assets prior to the commencement of these chapter 11 cases. During the marketing process, relevant information regarding the Debtors' business was made available in the data room, allowing potential bidders to conduct diligence on the Debtors' business. To the extent that any potential bidder has diligence

requests beyond what is included in the data room, such bidders receive requested information as such information is available

7. To date, SSG has contacted over 298 potential buyers, with over 65 executing non-disclosure agreements. Currently, there are at least 9 active potential buyers conducting due diligence on the Debtors' business. Based on the numerous conversations that I and other members of the SSG team have held with each potential bidder, I believe the Debtors are positioned, given the expedited timeline of the sale process, to receive actionable, value-maximizing, binding Bids on or before the Bid Deadline.

8. As of today, the Debtors have received one joint written proposal for a stalking horse bid that contemplates an acquisition of substantially all of the Debtors' Assets. SSG and the Debtors negotiated with the joint stalking horse bidders regarding value and key terms, including purchase price, deposit, assumed liabilities, excluded assets, deal contingencies, and timing of closing a Sale Transaction.

9. After extensive negotiations and due diligence efforts, the Debtors selected the proposal by Gordon Brothers Commercial & Industrial, LLC, on behalf of its contractual joint venture with Nations Capital, Inc. or its designee, including the Partner (the "Buyer") as the Stalking Horse Bid. On March 7, 2023, the Debtors and the Buyer entered into the Asset Purchase Agreement (including all exhibits and schedules related thereto, the "Stalking Horse Agreement"), whereby the Buyer proposes to purchase substantially all of the Debtors' Assets (as further defined in the Stalking Horse Agreement, the "Acquired Assets") for cash consideration of $27,100,109, subject to certain holdbacks and adjustments (the "Purchase Price"). The Stalking Horse Agreement also contemplates entry into a Transition Services Agreement, pursuant to which the

Debtors will provide certain services to the Buyer for a defined period of time post-closing following consummation of the transaction while the Acquired Assets are transferred to the Buyer.

10. Based on my knowledge of and experience with the prepetition marketing process and the extensive, arm's length, and good-faith negotiations between the parties, I believe entry into the Stalking Horse Agreement is in the best interests of the estates and best positions the Debtors under the present circumstances to achieve the highest or otherwise best outcome of the sale process. SSG expects to continue to market the Assets pursuant to the Bidding Procedures and, if necessary, conduct an Auction for the Assets.

11. The Stalking Horse Agreement provides a floor above which other bidders can bid. I believe other bidders currently intend to participate in the auction. Pursuant to the Stalking Horse Agreement, the Buyer is prepared to close the Sale Transaction on a timeline consistent with the milestones set forth in the proposed Bidding Procedures Order. I believe that the proposed Bidding Procedures set forth an appropriate process to test the value of the Acquired Assets, and that the fairness and reasonableness of the consideration to be paid by the Buyer or another successful bidder for the Acquired Assets ultimately will be demonstrated by further market exposure and an open and fair Auction.

12. To my knowledge, there was no fraud or collusion between the Buyer and the Debtors or between the Buyer and other bidders, nor any attempt to take unfair advantage of other bidders, during the marketing process. Moreover, I understand that all parties involved in the Sale Transaction were represented by competent counsel and negotiated in arms-length bargaining positions.

**There Is A Sound Business Purpose for Bid Protections**

13. I believe that the $27,100,109 consideration (subject to post-closing adjustments) in the Stalking Horse Agreement provides significant value to the Debtors' estates and will be used to repay obligations of the Debtors as approved by the Court. The Stalking Horse Bid also provides an opportunity to maximize the value of the Debtors' assets by allowing them to conduct an Auction (if necessary) to secure higher or better Bids for the Acquired Assets.

14. In exchange for the aforementioned value that the Buyer is providing to the sale process, the Debtors ultimately agreed to grant the Buyer the Bid Protections. I believe that the Bid Protections were the product of good faith, arm's length negotiations amongst the parties, with the Debtors at all times acting in the interest of their estates and consistent with their fiduciary duties. The Bid Protections were heavily negotiated and scrutinized by the Debtors and their professionals.

15. Specifically, the Debtors agreed to a breakup fee of $813,006 (the "Break-Up Fee"), which is equal to 3.0% of the Purchase Price, plus reimbursement of up to $275,000 in reasonable and documented costs and out-of-pocket expenses (the "Expense Reimbursements") incurred by the Buyer, payable upon certain termination events set forth in the Stalking Horse Agreement. This is consistent, in my experience, with breakup fees and expense reimbursement provisions provided to stalking horse bidders in comparable transactions reflected in prior transactions approved by this Court.

16. Moreover, I understand that the Bid Protections were, and remain, a critical component of the Buyer's commitment. I understand that the Buyer has expended, and will continue to expend, time and resources negotiating, drafting, and performing pre-acquisition planning activities necessitated by the sale, despite the fact that its Bid will be subject not only to

Court approval, but also to overbidding by third parties. I believe that the Bid Protections are necessary to induce the Bid submitted by the Buyer, and if the Court does not approve the Bid Protections, there is significant risk that the Buyer will elect not to serve as the "stalking horse," to the detriment of the Debtors' estates. In my experience, stalking horse bidders almost always demand similar protections in exchange for the value of acting as the stalking horse. Accordingly, I believe the Bid Protections will maximize the value of the Acquired Assets, and thus the Debtors' estates, and are a valid and sound exercise of the Debtors' business judgment.

17. I believe that to enhance the value of the Acquired Assets and to maximize the value of the Debtors' estates: (a) the Baseline Bid at any Auction for substantially all of the Debtors' assets should be the greater of (i) the Stalking Horse Bid and (ii) any other Qualified Bid (or Qualified Bids when considered together) that exceeds the Stalking Horse Bid by at least the aggregate amount of $200,000 *plus* the Break-Up-Fee *plus* the Expense Reimbursement Amount; (b) if the Stalking Horse Bid is the Baseline Bid, the initial Minimum Overbid for an Auction Package containing substantially all of the Debtors' assets should be the aggregate amount of $200,000 *plus* the Break-Up-Fee *plus* the Expense Reimbursement Amount; and (c) otherwise, the Minimum Overbid for an Auction Package containing substantially all of the Debtors' assets should be $100,000. I believe that by setting now the Baseline Bid, the initial Minimum Overbid, and increments for the Subsequent Bids, interested parties will have sufficient time to formulate their bids and bidding strategy.

## Conclusion

18. Based on my experience and my personal knowledge of the Debtors' commercial circumstances and the marketing process of the Assets, I believe that designating the Buyer as the stalking horse bidder for the Acquired Assets is in the best interests of the estates, and that the Bid

Protections were necessary to induce a stalking horse bid for the Acquired Assets, which will ultimately maximize value to the Debtors' estates.

*[Remainder of page intentionally left blank]*

- 8 -

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: March 7, 2023
West Conshohocken, Pennsylvania

*/s/ J. Scott Victor*
J. Scott Victor
Managing Director
SSG Advisors, LLC